Susan BREMILLER, et al., Plaintiffs,

v.

CLEVELAND PSYCHIATRIC
INSTITUTE, et al.,
Defendants.

No. 1:94 CV 1151.

United States District Court,
N.D. Ohio,
Eastern Division.

Feb. 29, 2000.

**4**

Karen Marie Crist, Howard A. Schulman, Jack M. Schulman, Schulman, Schulman & Meros, Cleveland, OH, for Susan Bremiller, On Her Own Behalf and On Behalf of All Others Similarly Situated, Plaintiffs.

Patricia F. Weisberg, Nancy A. Noall, Jonathan Greenberg, Carl E. Anderson, II, Katherine Anderson Friedell, Walter & Haverfield, Cleveland, OH, for Defendants.

*ORDER*

OLIVER, District Judge.

## I. BACKGROUND AND PROCEDURAL HISTORY

On June 3, 1994, Plaintiff, Susan BreMiller ("BreMiller"), filed a complaint against the Cleveland Psychiatric Institute ("CPI"), now known as Northcoast Behavioral Health Care System; Michael Hogan, Director of the Ohio Department of Mental Health, in his individual capacity ("Hogan"); Sandra Rahe, Acting Medical Executive Officer and CEO of CPI, in her individual capacity ("Rahe"); Douglas Aaron, a CPI employee ("Aaron"); and John Does Nos. 1–10.[1] Plaintiff seeks

---

1. Plaintiff has made no effort to substitute real parties for the John Doe plaintiffs. Therefore, the court dismisses them from the lawsuit pursuant to Fed.R.Civ.P. 4(m).

recovery under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 for sex discrimination, sexual harassment, creation of a hostile work environment and retaliatory discharge. Plaintiff also asserts claims under 42 U.S.C. §§ 1983 and 1985 for violations of the 5th and 14th Amendments to the United States Constitution. All state law claims brought by Plaintiff have previously been dismissed.

On September 1, 1994, BreMiller filed a motion to maintain her action as a class action. In an order dated January 12, 1995, the court granted Plaintiff's motion to certify the class and defined the class as "those women at CPI with claims of sexual harassment and discrimination which accrued between February 4, 1993 and December 1, 1993." Also on January 12, 1995, the court granted in part and denied in part Defendants' motion to dismiss for lack of jurisdiction and for failure to state a claim. The court held that BreMiller's § 1983 and § 1985 claims for damages against CPI were barred by the Eleventh Amendment; BreMiller's § 1983 and § 1985 claims against CPI for injunctive relief were not barred. The court also held that BreMiller could not sue the individual defendants for purposes of imposing personal liability on them under Title VII. The court further concluded that it had jurisdiction over all of BreMiller's Title VII claims and that punitive damages under Title VII were not statutorily permissible against CPI. The court found that BreMiller could maintain a claim for conspiracy under § 1985(3) as well as equal protection claims of sexual harassment and discrimination under § 1983 against the individual defendants. Lastly, the court found that Defendants were entitled to qualified immunity on BreMiller's procedural due process claims but were not entitled to qualified immunity on her equal protection or substantive due process claims.

On August 25, 1995, the court denied Defendants' motion for reconsideration of class certification, and at the same time, redefined the class as "[t]hose women at CPI with claims of sexual harassment and/or sex discrimination between February 4, 1993 and the date of the trial." In that same order,

the court denied Defendants' motion for reconsideration of this court's ruling that the named defendants were not entitled to qualified immunity regarding Plaintiff's substantive due process claims.

Now pending before the court are Defendants' Motion to Decertify the Class (Doc. No. 149) and Defendants' Motion for Summary Judgment (Doc. No. 197). For the reasons that follow, the court denies Defendants' Motion to Decertify the Class and grants in part and denies in part Defendants' Motion for Summary Judgment.

## II. FACTS

### A. *Sexual Harassment*

#### 1. The Defendants

Defendant CPI was formerly a state comprehensive, mental health treatment facility for a four-county area: Cuyahoga, Geauga, Lake, and Lorain. CPI was and is an acute in-patient psychiatric state facility. CPI receives individuals for admission and provides treatment and evaluation in a medium security setting for individuals referred by the county and municipal courts. CPI is now known as North Coast Behavioral Health Care Center, North Campus. CPI employs approximately 400 employees, roughly one-third of whom are women. CPI also contracts with an agency, Brason's Willcare, which provides nurses to work on various wards in the facility. Finally, CPI permits student nurses to receive training at CPI.

Defendant Rahe is currently Chief Operating Officer of CPI. In 1992, Rahe was Acting CEO of CPI. In June of 1993, Rahe was appointed CEO and, on August 1, 1995, pursuant to a merger with other states facilities, Rahe was appointed Chief Operating Officer of the CPI facility.

Defendant Aaron is currently an employee of CPI and has been since July 20, 1987. Aaron was hired as a hospital aide and was promoted to a Therapeutic Program Worker ("TPW") position.

On July 21, 1997, the parties filed a joint stipulation dismissing Michael Hogan from the lawsuit.

## 2. CPI's Sexual Harassment Policies and Procedures

At all relevant times, CPI has had a written policy prohibiting sexual harassment. (*See* Defs.' Mot.Sum.J., App. I–A, Deposition of Sandra Rahe ("Rahe Depo."), Ex. 20). The policy defines sexual harassment as "any physical or verbal conduct of a sexual nature as well as repeated and unwanted sexual requests and advances." *Id.* A non-exclusive list of behaviors that are prohibited by the policy provides examples of the type of conduct covered.

The policy expressly sets forth the procedures to follow should sexual harassment occur. First, the complainant is to contact the Equal Employment Opportunity ("EEO") Officer to discuss the perceived sexual harassment. The EEO Officer is to discuss the issues raised with the complainant, explain the criteria for a formal complaint, explain the discrimination procedures, and request an opportunity to investigate and resolve the complaint. If the complainant desires, he or she may immediately file a formal discrimination complaint, and the EEO Officer is to assist the complainant as necessary to complete the form. The EEO Officer then investigates the complainant's facts and attempts to resolve the complaint. Within thirty days, the EEO Officer must submit a written notice to the complainant proposing a solution or giving a reason for the denial of the complaint. In either event, the employee is entitled to file a formal complaint at any time and request a formal hearing. A complainant also has the right to file a complaint with the Ohio Civil Rights Commission or the Equal Employment Opportunity Commission.

The sexual harassment policy also requires supervisors who are contacted by employees regarding sexual harassment or who observe sexual harassment to direct employees to the EEO policy and refer any complainant to the EEO Officer. Supervisors are also required to immediately contact the EEO Officer for technical assistance upon notice of an incident. Discussions and resolutions are to be documented and a copy is to be given to the EEO Officer. Any observer of sexual harassment is required to report the incident to the EEO Officer.

In addition to having a sexual harassment policy, CPI has also mandated sexual discrimination training, including training on sexual harassment, to its employees from at least 1988 to the present. Training is conducted by the Department of Mental Health in Columbus and also by CPI's EEO Officer. (Defs.' Mot.Sum.J., App. I–D, Ruth Spencer Depo. ("Spencer Depo.") at 71–72). Typically, a training report is completed by the trainer and frequently evaluation forms are completed by the attendees. (Defs.' Mot. Sum.J., App. II–B, Debra Davis Aff. ("Davis Aff."), Ex. 1). According to Defendants, most of the employees who were deposed in this case either testified that they received sexual harassment training or simply could not recall whether they received training. However, a number of the class members have stated in affidavits that they did not receive sexual harassment training at CPI.

## 3. Description of the Class Members and Their Allegations

### a. Bonnie Ameche

While she does not claim to have been sexually harassed by anyone at CPI, Bonnie Ameche, CPI's Director of Nursing Education and the Director of Education and Staff Development since the fall of 1984, has submitted an affidavit in support of Plaintiff's claim that sexual harassment at CPI was pervasive. Ameche was responsible for the general orientation of all new employees until some time in the early 1990's. (Pl.'s Opp. to Defs.' Mot.Sum.J., Bonnie Ameche Aff. ("Ameche Aff.") ¶ 2). After her first couple of years at CPI, more and more sexual harassment began occurring; new employees began complaining to her that they experienced sexual harassment during orientation and after their orientations were completed. (*Id.* at ¶ 4). Beginning with her first group of nurses, every class of nurses in orientation reported to her that its members had problems with male employees sexually harassing them in the small, closed-in space of the medication room. (*Id.* at ¶ 5). Ameche recalls the names of twelve nurses who complained to her about sexual harassment. (*Id.*

at ¶ 6). Ameche also claims that she personally observed a group of TPWs sexually harassing a secretary who was a Jehovah's Witness and very religious. (*Id.* at ¶ 6).

Ameche frequently reported incidents of sexual harassment to members of CPI management, but because she felt as if nothing was being done by the administration, began to incorporate suggestions on how to respond to sexual harassment into her orientation sessions. (*Id.* at ¶ 11–12). Rahe later informed Ameche that she was not to talk about sexual harassment in her meetings with new nurses. (*Id.* at ¶ 15). In 1991, Ameche organized a group of 15–16 nurses who had experienced sexual harassment to meet to discuss the problem with Ruth Spencer, then Director of Nursing. (*Id.* at ¶ 13). She also claims that in 1993, she met with Carol Peters, the Director of Nursing, to discuss conducting more sexual harassment training for nurses at CPI. (*Id.* at ¶ 17).

### b. Susan BreMiller

Plaintiff BreMiller is the class representative. She is a registered nurse who was a regular, full-time employee of CPI from August of 1991 until May of 1992. In 1993, BreMiller sought to return to work part-time at CPI after having taken time off to have a baby. Because CPI does not hire part-time nurses, BreMiller was advised to apply with Brason's Willcare. At BreMiller's request, Brason's Willcare assigned her to work at CPI.

BreMiller claims that she was sexually harassed by several men from the day she began working at CPI until she was fired on June 7, 1993. (Pl.'s Opp. Defs.' Mot.Sum.J., Susan BreMiller Aff. ("BreMiller Aff.") ¶¶ 2 and 3). According to BreMiller, there were so many times that she was called names, looked at in a leering manner, or made to endure a sexually suggestive comment that she cannot remember or keep them all straight in her mind. (*Id.* at ¶ 20). Below are the specific acts of harassment that allegedly occurred against BreMiller.

During her orientation, David Sladewski, head of security, told her personal details about his love life and asked if she had affairs.[2] (*Id.* at ¶ 4). Sladewski also harassed BreMiller several times after she returned to work from her maternity leave. For instance, Sladewski told her "it was too bad [she] wasn't breastfeeding anymore because '[her] breasts were so much more prominent' before" and also asked her to have an affair. (BreMiller Aff. ¶ 17). BreMiller recounts that when she reported sexual harassment by Michael English ("English"), a police officer in CPI's security department, to Sladewski, his supervisor, Sladewski suggested that BreMiller have an affair with him instead of English because "older men have more experience in pleasing a woman." (BreMiller Aff. ¶ 18). He then tossed a pair of handcuffs on his desk and remarked, "Besides, I have these." BreMiller reported these incidents to Ann Kucklick, a CPI security guard, and to Bonnie Ameche but did not file a report with CPI management. (BreMiller Depo. at 143–44).

During her orientation, Anthony White, a housekeeper, often touched her, saying things like, "I'd like to do you after work sometime" and "Um, don't you look good." Even after she told him she was married and not interested, he persisted. (Bremiller Aff. at ¶ 5).

Also during orientation or soon after, Charles Newton, a TPW, told her "Um, I'd like to eat that pussy." (*Id.* at ¶ 6). BreMiller claims that on May 1, 1993, Newton told her to "shut up you ugly fucking white bitch" after reporting him for verbally abusing two patients. Several days later, he came toward her with his fists clenched and said "I'm going to get you bitch." (*Id.* at ¶ 19). BreMiller did not file a written report about these incidents and does not allege that she informed anyone of them. (BreMiller Depo. at 143–144).

Tim Swanson, a dietary worker, came into BreMiller's office on one occasion and said, "So you're the new nurse. I could use some

---

2. Under the "continuing violation" theory, the court can consider claims of harassment that occurred before the liability period began. *See* Order of January 12, 1995 (citing *Hull v. Cuya-* *hoga Valley Bd. of Educ.*, 926 F.2d 505 (6th Cir.1991)); *Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 876–877 (D.Minn.1993).

private duty nursing . . . ." (BreMiller Aff. at ¶ 10). She told him to leave her alone, but he kept making comments to her.

Chief of CPI Police Gerald Brown also allegedly made degrading comments to her about her clothing and her body on at least twenty occasions. He told her things such as "Oh boy, I like that rear view" and "I wish I could get me some of that", and simply laughed when she told him his comments were offensive. (*Id.* at ¶ 11).

BreMiller also maintains that she was sexually harassed by Michael English. English asked if she would have an affair with him and told her he was "horny" for her and got a "hard on" whenever he saw her. She states that, after she told him she was not interested, he grabbed her by the shoulders, spun her around, and kissed her (*Id.* at ¶ 16). BreMiller states that she informed both Kucklick and Ameche about these incidents. (BreMiller Depo. at 143–144).

Lastly, BreMiller claims to have been sexually harassed by Douglas Aaron ("Aaron"), a TPW. Prior to May 1, 1993, BreMiller had an excellent working relationship with Aaron and had never been harassed by him in any way. (BreMiller Aff. ¶ 21). However, on May 16, 1993, the next time she worked with Aaron after having reported Charles Newton for verbally abusing two patients, he started coming on to her very strongly. (*Id.* at ¶¶ 19, 24).

Also on or about May 16, 1993, BreMiller allegedly told Aaron that she heard a rumor that he had stolen a set of four point leather restraints and used them during sex with women; BreMiller testified that she informed Aaron of this rumor because she thought he should hear what people were saying about him. (BreMiller Depo. at 159, 258, 260). She claims that Aaron asked her to discuss something with him later that same day in the social worker's office and that she agreed to do so. According to BreMiller, when she met with Aaron, he

requested that she have a sexual relationship with him and she told him that she was not interested.[3]

BreMiller further states that, on May 23, 1993, Aaron called her at work and said he had been watching her and knew she was at work because he'd seen her car. He told her he was going to call her at home the next day and have phone sex with her. Aaron allegedly made several more crude statements about having sexual intercourse with her. (BreMiller Depo. at 261; BreMiller Aff. ¶ 25). BreMiller states that she met with Aaron later that day and told him that she wanted him to leave her alone.

BreMiller alleges that after this incident as well as several phone calls by Aaron to her home, she spoke with the Medina Post of the Ohio Highway Patrol about the situation. They informed her that they could do nothing unless Aaron actually physically touched her. BreMiller states that she did not file a report with the Medina Post because she did not want them to contact Aaron. (BreMiller Aff. ¶ 28).

Despite BreMiller's refusals, Aaron continued to sexually harass her. Eventually, BreMiller became so concerned about him that she complained to Bonnie Ameche on June 3, 1993. They developed a plan that involved enlisting the help of some other people in CPI's management. BreMiller and Ameche did not put anything in writing. (BreMiller Aff. ¶¶ 29, 30; Ameche Aff. ¶ 22). On June 4, 1993, Ameche talked to Ruth Spencer, Director of Human Resources; Carol Peters, Director of Nursing; and Sladewski about the fact that BreMiller was being harassed by a member of the staff. However, at BreMiller's request, she did so without mentioning Aaron's name. (Ameche Aff. ¶ 23, Exs. 4, 5, 8, and 18).

BreMiller asserts that Aaron's most violent attempt at sexual harassment occurred on June 5, 1993, when he committed sexual assault on her at gun point. (BreMiller Aff.

---

**3.** Aaron recalls the day differently. According to Aaron, BreMiller asked him whether it was true that he put people in restraints, and he told her it was just a rumor. After that, he and BreMiller talked openly about sex for several hours. According to Aaron, when he and BreMiller met later in the social worker's office, they showed each other their genitalia. Aaron then asked her if she wanted to have sex, and BreMiller replied that she would think about it and let him know. (Aaron Depo. at 36–41).

¶¶ 35–38). On that day, BreMiller was scheduled to work at CPI from 3:00 p.m. to 11:30 p.m. BreMiller claims that, several times while she was working, Aaron came into the nursing office on the floor where she was stationed. BreMiller never contacted Aaron's charge nurse to indicate that Aaron was coming to her ward. (BreMiller Depo. at 266–267). In an attempt to appease him, BreMiller agreed to meet him in the break room on her lunch hour at 8:00 p.m.

On her way to the break room, BreMiller encountered Aaron in the stairwell. Aaron told her that he had already been to the sixth floor break room and people were in it, so they would not be able to have a private conversation there. Aaron told her he would take her to another room. (BreMiller Depo. at 281).

BreMiller states that she followed Aaron to the ninth floor into a classroom area. (BreMiller Depo. at 281–82). Once there, BreMiller alleges that Aaron continued to make graphic comments to her about sex and having sexual intercourse with her. (BreMiller Aff. ¶ 35). However, Aaron kept blocking the door closest to her. There was a second door, but a number of chairs lay between BreMiller and that door. Moreover, had she gone out the second door, she would have had to pass the first door to escape the floor, and Aaron could have intercepted her. BreMiller eventually conceded that there was no escape until Aaron was willing to let her leave. (Id. at ¶ 36).

At some point, BreMiller claims that Aaron approached her and began fondling her. She alleges that Aaron told her he could rape her and that there was a bed with restraints somewhere in the hospital and that was where he wanted to do it, with her tied down.

At one point, he exposed himself to her and began masturbating. He then pulled out a gun and pointed it at her. He allegedly handed her the gun so that she could see it was real, but BreMiller immediately handed it back to him because she is afraid of guns. (Id. at ¶ 37).

After an hour and a half, Aaron let BreMiller leave. (Id. at ¶ 38). BreMiller states that soon after she returned to her floor, Aaron came around again. She told him to leave after he asked her to go to a sex shop. At first he refused, but he eventually left her floor. (Id. at ¶ 40). According to Defendants, several of BreMiller's co-workers noted that she did not appear to be upset upon returning to her post; but rather, that she was pleasant and laughing. (Defs.' Mot. Sum.J. at 45 n. 62 (citing Defs.' Mot.Sum.J., App. I–Y, Jean Stubbs Depo. at 15, 24–25; Defs.' Mot.Sum.J., App. I–Z, Gladys Rose Depo. at 14, 18)).[4]

Later that evening, BreMiller met with her supervisor, Claudette Austin, to discuss an unrelated matter. BreMiller did not tell her about the incident since Aaron is African-American and she believed Austin to be prejudiced against whites. (BreMiller Aff. at ¶ 41). Austin testified at her deposition that when she met with her, BreMiller did not appear to be upset. (See Defs.' Mot.Sum.J., App. I–AA, Claudette Austin Depo. at 24).

BreMiller asserts that as soon as she got home that night and was in a place of safety, she told her husband everything that had transpired between herself and Aaron. (BreMiller Aff. at ¶ 43). Together, they called and reported the gun incident to the Medina Post of the Ohio Highway Patrol and to Ameche. (Id. at ¶¶ 43–44).

---

4. Aaron's version of the June 5, 1993 gun incident is drastically different. Aaron testified that he called BreMiller and asked her to have lunch with him and that BreMiller followed him up the stairs from the sixth floor to the ninth floor. According to Aaron, he went to the ninth floor because he did not want anyone to see them; he was concerned about his relationship with his fiancée who also worked at CPI. Aaron states that they went into the ninth floor classroom and that BreMiller told him she needed more time to decide whether to have sex with him. They then talked about some other things and eventually went back downstairs to work after about thirty minutes. (Aaron Depo. at 74–77). Aaron further states that after work that evening at approximately 11:30 p.m., BreMiller followed Aaron in his car to his home because he wanted to show her something. Aaron went into his house and got his gun because BreMiller had told him she and the "cop" whom she had been with had handcuffs and a gun. BreMiller held the gun and rubbed it down the front of her body, all the while remaining in her car. She then gave him the gun back and drove away. (Aaron Depo. at 77–81).

The next day, BreMiller spoke with Ruth Spencer and her supervisor, Ms. Rivers. Without going into detail about the gun incident, she told Rivers she would not come in to work the next night. Spencer told BreMiller that she would have to go into work on Monday to file a report. Also on that same day, BreMiller reported the incident to the Cleveland Police. (*Id.* at ¶ 46).

On June 7, 1993, BreMiller met with Sandra Rahe and Jan–Marie deBrossard, the head of security, at CPI. (*Id.* at ¶ 48). After telling them what had happened, Rahe helped BreMiller fill out a report about the incident. (*Id.* at ¶ 50). According to Rahe, she told BreMiller that CPI would follow policy and procedure and the investigation would be conducted by the CPI Security Department. Rahe also told BreMiller that the incident had been reported to the Ohio Highway Safety Patrol, which would be doing its own investigation to determine whether criminal activity had occurred. If either investigation produced enough evidence, CPI would take corrective action administratively and the Highway Patrol would present the case to the Prosecutor and the Grand Jury, if appropriate. (Rahe Depo. at 88, 89).

At the end of the meeting, Rahe informed BreMiller that she did not want her to return to work because her presence at CPI posed a danger to staff and patients. BreMiller states that Rahe told her it was easier to get rid of her because she was a non-union employee and Aaron was a union employee. (BreMiller Aff. at ¶ 51). According to Defendants, Aaron was permitted to come to work based upon the union contract's limits on when an employee can be placed on administrative leave. (Rahe Depo. at 64–66). Because of Aaron's status as a union employee, CPI states that it had to be certain to follow protocol. Until evidence was gathered to indicate that Aaron should be put on administrative leave, Rahe determined that the best course of action was for BreMiller not to return to CPI for awhile. (Rahe Depo. at 75).

After the investigation was completed, Rahe determined that BreMiller was not telling the truth. (Rahe Depo. at 173–175). While Rahe did not fully believe Aaron's side of the story either, she did not believe that any non-consensual sexual interactions had occurred between Aaron and BreMiller. No corrective action was taken against either Aaron or BreMiller, and BreMiller was not called back to work at CPI through Brason's Willcare. (Rahe Depo. at 178–180).

### c. Mary Kennedy

Mary Kennedy has worked at CPI as a food service manager since 1987. (Pl.'s Opp. to Defs.' Mot.Sum.J., Mary Kennedy Aff. ("Kennedy Aff.") ¶ 1). Kennedy has filed a companion suit to this one, Case No. 1:99CV3151.

In March of 1987, Swanson grabbed Kennedy's rear end. In response, she slapped him. She also informed Rich Thomas, the operational manager of dietary, housekeeping, and maintenance, about Swanson's actions. Thomas told her he would meet with Swanson, and Swanson did not bother her again for several years. (*Id.* at ¶ 2).

However, at some point, Swanson began harassing her again. For example, while Kennedy does not provide a specific date, she alleges that on one occasion Swanson tossed a condom on her desk and told her to wait for him. She told him to leave her office and again informed Thomas of the incident. On April 20, 1993, Swanson told her that he would like to use Vaseline on her "tonight." (*Id.* at ¶ 22). Kennedy later wrote a memo to Swanson in which she reprimanded him for making the comment and told him that his advances were unwelcome. She copied the memo to Rich Thomas; Ruth Spencer and Debra Davis, the EEO Officer. Rich Thomas informed her he would monitor Swanson's behavior, but Kennedy does not recall hearing from Spencer or Davis. (*Id.*) Defendants argue that in response to this incident, the EEO Officer conducted a training session on April 28, 1993, with all of the dietary staff, the purpose of which was to clarify and reinforce proper work behavior and to explain the consequences of inappropriate conduct of a sexual nature. (Defs.' Mot.Sum.J. at 24).

In 1990, Charles Newton began harassing her several times a day. He would look at her and stick his tongue out of his mouth,

making licking movements. He told her things such as "I wish I was between your legs when you walk." Even after Kennedy asked him to stop, Newton continued to harass her. (*Id.* at ¶ 4). When she told Thomas about Newton's actions, he did nothing other than to tell Kennedy not to let Newton bother her. (*Id.* at ¶ 5). Upon taking Thomas' advice, Kennedy claims that Newton's harassment got even worse. (*Id.* at ¶ 6). She complained again to Thomas, Chief Brown, Newton's supervisor, and to the Director of Nursing, none of whom helped her. (*Id.* at ¶ 7). After she filled out incident reports regarding Newton's sexual harassment of her, the harassment again escalated. One time, he entered an elevator with Kennedy and exposed himself to her. (*Id.* at ¶¶ 12–15).

Because Kennedy did not receive any response on her incident reports, she ultimately filled out a complaint in Cleveland Municipal Court charging Newton with assault. (*Id.* at ¶¶ 16–17). After she filed charges, Newton and several of his friends at CPI threatened to hurt her if she testified against him. (*Id.* at ¶ 18). Kennedy claims that Newton was never disciplined by CPI for the complaints she had filed against him. (*Id.* at ¶ 19). A meeting between her, Newton, Rahe, and Newton's union representative also did nothing to solve the problem. (*Id.* at ¶ 20).

In December of 1994, Charles Newton was indicted for the acts of sexual harassment perpetrated on Kennedy and another nurse. After his indictment, Newton and his friends began harassing Kennedy. (Kennedy Aff. ¶ 29). Once Newton pled guilty to two counts of gross sexual imposition, Swanson began harassing Kennedy again, allegedly in retaliation for Kennedy's role in Newton's arrest. Kennedy again filed incident reports and also spoke with Rich Thomas about the situation and informed Thomas that the corrective actions he'd taken with Swanson had not been successful. (*Id.* ¶ 33). In November of 1995, Swanson told her that he would perform sexual acts on her for money. (Kennedy Aff. ¶¶ 33–34). Kennedy again reported Swanson for this act, but did not hear of any disciplinary action being taken against

him. (*Id.* at ¶ 34). Defendants state that this matter was referred to CPI police for investigation. (Defs.' Mot.Sum.J. at 24). Several months later, she received a letter stating that Swanson had been fired for absenteeism. (Kennedy Aff. ¶ 34).

Kennedy also claims that many employees would complain to her about sexual harassment because she was the supervisor of the dietary department. She avers that she helped the following individuals file incident reports about Swanson: Yvonne Suttles (Swanson pressed his genitalia against her buttocks when she leaned over to get something out of a cooler), Calvesta Harris (Swanson made lewd comments to her about sexual intercourse and oral sex), and Teason Jones (Swanson fondled her in a bathroom and asked her for sex). (*Id.* at ¶¶ 36–38). Finally, Kennedy remembers that Sue Kucklick, Lori Millard, Susan BreMiller, Debra Davis and Calvesta Harris also complained about Swanson. (*Id.* at ¶ 39).

Kennedy maintains that after the merger of CPI and another psychiatric institute in 1995, the management of the new facility began performing many retaliatory acts against her for her involvement in the instant suit. In September, 1995, she was demoted and her salary was decreased significantly. (*Id.* at ¶ 43–44). Kennedy was made to work a different shift than she had for her first seven years at CPI and was told she had to work three weekends a month when she had never had to work weekends before. (*Id.* at ¶ 45). She also was told that she was no longer permitted to write anyone up. (*Id.* at ¶ 46). Shortly after she began her new position, Kennedy began receiving her first negative reviews. (*Id.* at ¶ 47).

Beginning in late 1996, Kennedy began having problems with Newton again. She filed an incident report in January, 1997. However, she states that when she called the chief of security's office in May, he informed her that the report had been logged, but that they could not locate the actual incident report. (*Id.* at ¶¶ 51–54). Kennedy further claims that in early 1997, her requests for vacation, comp time and personal time were ignored or destroyed. She finally got them back in May, but those that were approved

were approved after the dates for which she had requested time off. (*Id.* at ¶ 55). Lastly, Kennedy states that she was denied a promotional opportunity in February of 1997 and that a person with less seniority was given the job. (*Id.* at ¶ 56).

### d. Monica Norman

Monica Norman ("Norman") has worked at CPI as an MIT, a ward secretary, since 1984. Norman asserts that Anthony White began to sexually harass her on a daily basis in 1993. (Pl.s' Opp. to Defs.' Mot.Sum.J., Monica Norman Aff. ("Norman Aff.") ¶ 2). According to Norman, White would touch his genitals and make suggestive remarks to her. (*Id.* at ¶ 3–4). Once, he grabbed her and rubbed up against her as she was going out the door of an elevator. (*Id.* at ¶ 5). Twice, she states, he asked her to "take a break and sit on [his] face," and on another two occasions, White dropped to the floor in front of her, as if he were going to look up her dress. (*Id.* at ¶¶ 6–7). She also claims that there were dozens of times when he would grab her arm, her hand, or her shoulder. (*Id.* at ¶ 8).

In August of 1994, White grabbed Norman from behind, slammed her down on the desk, held her wrists with one hand, pushed her face down with the other, and licked her on her face. From behind, he grabbed her breasts, pulled her back into him, and tried to pull up her dress. He groped under her dress and tore her pantyhose and her dress. He was pulled off of her by a co-worker. When Norman got up, White grabbed her again, slammed her into the chart rack, and started groping her again. (*Id.* at ¶ 9). All of this was witnessed by Joan Foliart, a psychologist who has been working for the State of Ohio since 1963. (Foliart Aff. ¶¶ 1–2). Norman did not file an incident report because she was afraid of White. (Norman Aff. ¶ 11). Several days later, she reported what White had done to Sladewski who simply told her to be careful. (*Id.* at ¶ 13–14). When she tried to tell Sandra Rahe, Rahe told her that she did not want to hear about it. (*Id.* at ¶ 15). White continued to harass her after this incident by calling her disgusting names and making insulting comments to her until he left CPI. (*Id.* at ¶¶ 16, 21).

Norman also says she saw White harass a number of other women. In the spring of 1994, Norman saw White touch Janice Alexander's breasts. (*Id.* at ¶ 23). She heard White tell Janice Alexander to "take a break and sit on my face" and saw White put his hand on Lori Millard's pregnant belly. (*Id.* at ¶¶ 24, 25). Norman heard White say something to Sandra Rahe about her "big butt" and her "big pretty legs." (*Id.* at ¶ 26). Finally, she claims that she recalls several other women complaining about White.

Norman states that the sexual harassment she experienced and knew that other women experienced affected both her home life and her work life. (*Id.* at ¶¶ 33–35). Nevertheless, because she assumed she would not be supported by the administration, Norman reported none of the above incidents to management or White's supervisor. (*Id.* at ¶¶ 29, 31–32, 37).

### e. Lori Millard

Lori Millard has worked as a licensed practical nurse ("LPN") at CPI since June of 1991. Millard was the plaintiff designated as Jane Doe in the companion action that has been voluntarily dismissed. (Pl.'s Opp. to Defs.' Mot.Sum.J., Lori Millard Aff. ("Millard Aff") ¶ 1).

Millard claims that she was sexually harassed by a number of men at CPI. For her first several years, the harassment was constant. (*Id.* at ¶ 2). Terry Griffin constantly asked her to go out with him, telling her he would leave his wife, making comments about her body and telling her how happy he could make her sexually. Even after she asked him to stop, he continued. When she complained, nurses and supervisors told her that was just the way Griffin was. (*Id.* at ¶ 3).

Millard claims that she was sexually harassed on elevators between seven and fifteen times per week. Every time she saw Ron Dorroh on an elevator, he would grab her and ask her for a date. She complained to nurses and supervisors about these incidents, but nothing was ever done. (*Id.* at ¶ 5). In April of 1994, Dorroh and Mike Harris got on the elevator, moved toward her with their arms outstretched as if to grab her

breasts, and pushed her into the corner of the elevator. Afterward, Dorroh moved his hands inside her coat, and Harris moved his hands toward her breasts; they stopped when someone walked by the open door of the elevator. (*Id.* at ¶ 8; Millard Depo. at 199–200). She states that Dorroh harassed her and asked her for dates every time she worked with him. (Millard Aff. ¶ 9).

Anthony White would make crude sexual suggestions to her whenever she saw him on an elevator. (*Id.* at ¶ 6). In December of 1993, she claims that White touched her pregnant belly in an elevator. (*Id.* at ¶ 7). Millard also states that White harassed her in July of 1993 when he followed her out of the building and told her he would like to have oral sex with her. (*Id.* at ¶ 14). Millard states that, in August or September of 1993, Anthony White used both hands to move her lab coat so that he could look at her body better. (*Id.* at ¶ 17).

In July of 1993, Newton harassed Millard several times by making suggestive comments to her about oral sex and sexual intercourse. (*Id.* at ¶ 15–16). Additionally, Millard alleges that, on several occasions in late 1993 and early 1994, David Ayers harassed her when he grabbed her arm and pulled her toward him while asking, "When are we going to go out?" (*Id.* at ¶ 18).

Millard also claims that a letter was circulated throughout the hospital calling her a "white bitch" and a "whore." In response, the administration posted a note on the bulletin board stating that they did not tolerate such activity. (*Id.* at ¶ 12). She claims that in a meeting to discuss the letter, Rahe told Millard that she was being harassed because she brought it on herself by bringing her personal life to work, referring to the fact that Millard was dating an African American man. (*Id.* at ¶ 13).

Like Norman, Millard claims to have also witnessed the harassment of other women at CPI. For example, Millard claims to have seen White grab Monica Norman's skirt as if to pull her toward him in May of 1993. (*Id.* at ¶ 34). She also claims that she saw

Charles Newton put his hands down the pants of Ethel Coleman in the summer of 1993. (*Id.* at ¶ 37).[5] She alleges that she saw Newton touching Debbie Clemens all over her body on February 19, 1994. (*Id.* at ¶ 41). Lastly, she states that she saw Newton standing between Ethel Coleman and Lizzie Davis with a hand on each woman's breasts in April or May of 1994. (*Id.* at ¶ 42). Millard asserts that her supervisor, Bobbie Hefferon, was aware of at least Newton's sexual harassment of Coleman but that she did nothing other than to have Millard work near Coleman when Newton was around. (*Id.* at ¶ 38).

Millard claims that she never filed a report about any of these actions because she had "learned early on at CPI not to report sexual harassment." (*Id.* at ¶ 23). She states that no one ever did anything about such reports and that at least one of her supervisors who did know about what had happened to her told her she had brought it on herself. (*Id.* at ¶ 24). She also feared retaliation by the men who had harassed her after they found out that she had filed a complaint. (*Id.* at ¶¶ 25–27).

According to Millard, life at CPI became much more difficult after the instant suit was filed. For example, Newton and other co-workers would quote portions of the Complaint to her or say things about sexual harassment to her when they saw her. (*Id.* at ¶¶ 44–45). She also states that after the suit, she was incorrectly charged with tardiness infractions two times; her charting was checked much more carefully than before the suit; she was made to work with a woman with whom she did not get along; she was reprimanded more frequently than other employees; one of the head nurses informed a doctor that Millard was mentally ill; and she was written up for saying the word "ass" in front of co-workers and her union would not help her file a grievance on the matter. (*Id.* at ¶¶ 50–56).

### f. Sue Mason

Sue Mason ("Mason") has worked as an LPN at CPI since May of 1992. (Pl.'s Opp.

---

**5.** Coleman denies that she was the victim of sexual harassment while employed at CPI and has opted out of this lawsuit.

14

to Defs.' Mot.Sum.J., Sue Mason Aff. ("Mason Aff.") ¶ 1). During her orientation, she claims that Newton harassed her more times than she can count. Whenever he saw her, he would say something offensive, such as "I'd love to get between those big thighs." (Id. at ¶ 3). Mason claims to have complained to other nurses and her supervisors about the situation, but that they would tell her to get used to it because that was how Newton was. (Id. at ¶ 5).

Mason was reassigned to a new floor after orientation, but states that Terry Griffin, a housekeeper, began harassing her when she started her new floor. Griffin would harass her every day, making hundreds of lewd suggestions to her regarding sex. (Id. at ¶ 8). Again, she states that she complained to other nurses, including her supervisors, but they merely told her that men had been harassing women for years at CPI, but nothing was ever done. (Id. at ¶ 9). Eventually Mason engaged in a consensual relationship with Griffin for a short period, but states that she only dated him because his constant harassment wore her down, and she thought he would leave her alone if she did what he wanted. Her relationship with Griffin began in December of 1992 and ended three months later when she told him she did not want to see him again. (Id. at ¶¶ 14, 16).

According to Mason, Griffin continued to harass her after the consensual relationship ended. In late spring or early summer of 1993, Griffin pulled her pants down in the treatment room on the sixth floor. (Id. at ¶ 17). During the summer of 1993, on more than one occasion, Griffin blocked the door of the employee locker room and tried to make her kiss him. (Id. at ¶ 18). At least ten times, he followed her into the sixth floor laundry room and touched her breasts and between her legs. (Id. at ¶ 19). Griffin also exposed himself to her several times in the laundry room and the employee locker room. On one occasion, he forced her to touch his penis. (Mason Aff. ¶ 20). Griffin's harassment of Mason stopped in November of 1993 when Mason started dating another co-worker, Jack Terry, to whom she planned to be married on August 23, 1997. (Id. at ¶ 21).

Mason also claims that Newton began harassing her again in early 1994. He asked Mason why she wouldn't go out with him, stating "I have a dick just like your boyfriend has a dick." (Id. at ¶¶ 22, 23). When Mason got away from Newton's unit, Newton continued to approach her on breaks. He would stick his tongue out of his mouth, move it around lewdly, and talk in very crude terms about how he could use his tongue on her. He would also say things like "I could fuck you so good."

Lastly, Mason alleges harassment by White. According to Mason, White made sexual remarks to her every time he saw her alone in elevators and outside the building. He would corner her, try to put his hands on her and say, "Come on baby, let's see what you've got," and "Oh you look so hot today." (Id. at ¶ 24). Mason also claims to have witnessed White doing similar things to other women. For example, she corroborates Millard's version of several of the incidents of sexual harassment against her by Newton. (Id. ¶¶ 25–27).

In the fall of 1993, Mason attempted to talk to Verdelle Hart, the nurse supervisor, about the sexual harassment she and the other nurses had been experiencing. Ms. Hart never called her back. (Id. at ¶ 31). She also claims after the instant suit was filed, things improved for a while, but eventually worsened. For instance, she asserts that on December 7, 1994, she was set up to be attacked by a patient who attempted to choke her. (Id. at ¶¶ 34–43). She further states that a few months after the suit was filed, she was standing in the cafeteria line together with several people, including Hart and Newton. Mason claims that Hart rubbed herself up against Newton and then said to Mason, "Oh, I better not do that. That might be mistaken for sexual harassment." (Id. at ¶ 48).

#### g. Cecilia Cooper

Cecilia Cooper ("Cooper") was an RN who worked at CPI, through Brason's Willcare, from 1985 to June of 1995. (Pl.'s Opp. to Defs.' Mot.Sum.J., Cecelia Cooper Aff. ("Cooper Aff.") ¶ 2). She claims that she was sexually harassed "almost continuously from

the first day [she] began working at CPI until [her] last day." (Cooper Aff. ¶ 3).

Cooper claims that Miken Ray, a TPW, frequently harassed her by putting his arms around her. He also routinely made suggestive remarks to her, such as telling her she had a "nice big ass" and that her lips were "nice" and looked "so warm." (*Id.* at ¶¶ 4, 9). He constantly made comments to her about her weight (*Id.* at ¶ 7). Ray allegedly harassed her whenever things were quiet on the floor and the two of them were working together. (*Id.* at ¶ 11).

Cooper also claims to have been harassed by Charles Brabson in 1994. (*Id.* at ¶ 12). She claims that, at least twice, Brabson came into the small office she was in, closed the door, and backed her into the wall, begging for a kiss. (*Id.* at ¶ 13). Even though she told him not to touch her, he would put his arms around her or put his head close to hers as if to smell her, or he would stand close enough for their two sides to touch each other. (*Id.* at ¶ 15).

Lastly, Cooper states that David Ayers hugged her even though she asked him not to. Ayers also told her a dirty joke one time when she was the nurse in charge of his floor. (*Id.* at ¶ 24). Another time when she was his supervisor, he allegedly drew pictures of naked men and showed them to everyone who was around. (*Id.* at ¶ 21).

Cooper maintains that in 1994 or 1995, she asked Carol Peters not to send her to the forensic unit because of the harassment by Ray and Brabson. She states that Peters told her she would have to work where she was needed or would not be called back to CPI. (*Id.* at ¶¶ 17–18). Cooper did not report the incidents to anyone else because she believed that, as an agency nurse, if she filed too many complaints, she would risk not being able to work at CPI. (Cooper Depo. at 50–52). Cooper acknowledges that she was not told this from management but that it was talk from the other nurses. (Cooper Depo. at 53). Cooper also did not complain or report the alleged harassment to Brason's Willcare. (Cooper Depo. at 45–47).

### h. Darlene Cooper Clay

Darlene Cooper Clay ("Clay") worked at CPI as an RN from November of 1993 until July of 1995. (Pl.s' Opp. to Defs.' Mot.Sum. J., Darlene Cooper Clay Aff. ("Clay Aff.") ¶ 1). During her orientation in January of 1994, she witnessed Charles Newton put his hands all over Debbie Clemens's body, including down her pants, touching her inside her pants and saying, "You know you like it, you know you want me." (*Id.* at ¶ 3). Also while she was still in orientation, Douglas Aaron would come into Clay's work area and lean over her as if he was going to kiss her. He would smell her neck and tell her that she smelled good. (*Id.* at ¶ 5). Several dozen times, Aaron grabbed her hand and scratched gently in her palm with his finger. (*Id.* at ¶ 6). In February of 1994, Aaron grabbed her shirt between her breasts with his finger and asked her "Do you taste as good as you smell?" (*Id.* at ¶ 7). Clay asserts that Ms. Sewell, her supervisor, laughed when she reported these events to her.

Otis Campbell frequently described his penis in front of Clay. (*Id.* at ¶ 8). Also, Campbell would talk to Clay and her co-workers about nurse Brenda Lewandowski's body. Once, Clay saw Campbell grab Lewandowski's hands, move his head toward her lap, and heard him make a crude comment to her. (*Id.* at ¶ 9).

Anthony White rubbed his body against Clay's whenever he walked by. (*Id.* at ¶ 10). White would stick his tongue out and move it all around and leer at her while he was doing it. He did this more times than Clay can count. (*Id.* at ¶ 11). White would also try to move so that he was very close to her, with his face inches from hers. (*Id.* at ¶ 12).

Additionally, Nathaniel Mumford, a TPW, told Clay that "he fucked two nurses at one time" and that Clay would like it too. (*Id.* at ¶ 13). Clay asserts that the TPWs would stand in the hallway, by the time clock, in the gazebo, or by the entrances and shout out crude invitations or comments about women's bodies or their clothes. (*Id.* at ¶ 15).

David Ayers, Miken Ray, and Melvin Caldwell regularly called the nurses "bitches" or

"whores." They would make it uncomfortable for any woman who worked near them. (Clay Aff. ¶ 17). Because she feared retaliation by her co-workers, Clay did not write up any male employees for sexual harassment. (*Id.* at ¶ 21–22).

Clay alleges that after the lawsuit was filed, there was a poster in the bathroom on one floor that said "sexual harassment will not be allowed in the workplace, but will be graded." She maintains that she reported the sign to the head nurse of the floor, but that the sign stayed up for several months. (*Id.* at ¶ 20).

Things at CPI went significantly downhill for Clay when her supervisor, Ms. Sewell, began giving her a difficult time after Clay refused to tell her whether she'd be interested in dating a "secret admirer". On four occasions, Sewell refused to send anyone to assist Clay after Clay called to ask for help. (*Id.* at ¶¶ 24–25). Finally, Clay began to look for a new job when one of her co-workers retaliated against her after she told him she would not go out with him. (*Id.* at ¶ 31–33).

### i. Tara Foreman

Tara Foreman was an LPN at CPI from June 10, 1993, until June 7, 1996. (Pl.s' Opp. to Defs.' Mot.Sum.J., Tara Foreman Aff. ("Foreman Aff.") ¶ 2). She alleges that Swanson sexually harassed her from the time she started working at CPI until he was finally fired in 1996. (*Id.* at ¶ 3). He continued saying offensive, sexual things to her even though she told him over and over that he should stop. (*Id.* at ¶¶ 5–9).

In the winter of 1995–1996, Melvin Caldwell moved next to her in an elevator and caressed one of her breasts with his hand. She pushed him away and told him not to do it again. However, very shortly after, Caldwell did it again in the nursing office of 6R. (*Id.* at ¶ 11). Whenever the two of them were alone, Caldwell would reach his hands out as if to grab her breasts and he would squeeze his hands as if he had her breasts in them. (*Id.* at ¶ 12).

Nathaniel Mumford would often comment that Foreman's unit was "titty city" because Foreman and one of her co-workers were buxom. (Foreman Aff. ¶ 14). Even though

Foreman repeatedly asked Mumford not to, he would put his arms around her. He did this dozens of times. (Foreman Aff. ¶ 15).

Terry Griffin would tell Foreman that he wanted to be with her, while telling her graphic details about his sex life. Even though she told him she did not appreciate his sexually-explicit talk, Griffin continued to tell her that he thought she was pretty and that he would make her happy sexually. (Foreman Aff. ¶ 16).

In the fall of 1994, Foreman's supervisor, Tim Burden, began to come on to her. (*Id.* at ¶ 18). When she refused his attentions, she began to get "written up" by Mr. Burden, and she was ultimately forced to leave her job, as disciplinary charges by Mr. Burden built up against her. (*Id.* at ¶¶ 18–25).

Foreman asserts that both Debra Davis, the EEO officer, and Bonnie Ameche warned her orientation class about being careful around the men at CPI because of the sexual harassment that took place there. (*Id.* at ¶¶ 27–29). Because Foreman was afraid nothing would be done to rectify the situation and because she did not want to anger any of the men, she chose not to report the sexual harassment she experienced. (*Id.* at ¶ 32).

### j. Cheryl Sims

Cheryl Sims ("Sims") is a secretary who worked at CPI from June or July of 1987 until June or July of 1995. (Pl.s' Opp. to Defs.' Mot.Sum.J., Cheryl Sims Aff. ("Sims Aff.") ¶ 2). She states that she was harassed when many of the men in the basement area where she worked would stand around and comment about the women who walked by. They would look them up and down in a leering way and usually say something about their bodies. According to Sims, this happened every day when she walked by them, sometimes several times a day. (*Id.* at ¶ 4).

Soon after Sims began working at CPI, John Griffin followed her into a small room and shut the door, all the while making comments about her body. Sims reported the incident to her supervisor, Alice Grisby, and thereafter, Griffin would make critical and insulting remarks about her. (*Id.* at ¶¶ 5–7). After complaining to Ruth Spencer, Spencer

called a meeting with both Sims and Griffin. In the meeting, Griffin became angry with Sims and denied the incident, saying he would not risk his job over someone like her. (*Id.* at ¶ 8). Spencer never asked her to file a formal complaint or an incident report. (*Id.* at ¶ 9). After the meeting with Griffin, the harassment escalated. (*Id.* at ¶ 10). Finally, after several months, she told Griffin to leave her alone, and from then on, he stopped harassing her. (*Id.* at ¶ 11).

### k. Pamela Sue Kucklick

Pamela Kuclick worked at CPI as a police officer from July of 1987 until April of 1994. (Pl.'s Opp. to Defs.' Mot.Sum.J., Pamela Sue Kucklick Aff. ("Kucklick Aff.") ¶ 2).

Kucklick alleges that when she first started working at CPI Tim Swanson would crouch in front of her, spread his arms, and ask her for dates. He only stopped after Kucklick complained to his supervisor, Mary Kennedy. (*Id.* at ¶ 4).

Anthony White put his arms around her several times even though she told him not to. She never reported these incidents to his supervisor, Carol Gholston, because he lived with her. She was also afraid of angering his many friends at CPI. He finally stopped bothering her after she kicked him. (*Id.* at ¶ 5–8).

Kucklick also corroborates several of BreMiller's allegations regarding the sexual harassment she experienced. (*Id.* at ¶¶ 9–16).

### l. Annie Rucker

Annie Rucker, an R.N., worked at CPI through Brason's Willcare from approximately 1987 until October of 1995. (Pl.'s Opp. to Defs.' Mot.Sum.J., Annie Rucker Aff. ("Rucker Aff.") ¶ 1).

Nathaniel Mumford would grab Rucker and hold her in a very hard hug. Even after she told him to leave her alone, he would not let go. (*Id.* at ¶ 3). Mumford refused to call her "Ms. Rucker" or "Annie," instead calling her "Country" or "Alabama." Despite her

requests to stop, he did this until the day she left CPI. (*Id.* at ¶ 15).

On one occasion, a TPW named Grady commented on her "old, skinny legs" in front of several other people. When the elevator door opened and Chief Brown was standing outside of it, Grady called to Chief Brown to look at "this old woman with these little, old skinny legs." While Rucker told Grady to stop, he told her to "shut up" and continued to make comments about her body. When she spoke with Chief Brown about the incident, he told her that he had already informed the nursing office about the incident. Rucker filed an incident report, but never heard anything about it. (*Id.* at ¶¶ 4–7).

Finally, Rucker also claims to have witnessed Charles Newton grab another nurse's buttocks. (*Id.* at ¶ 9).

### m. Mary Anne Moore

Mary Anne Moore, an R.N., was hired at CPI in 1985 and currently works there. (Pl.'s Opp. to Defs.' Mot.Sum.J., Mary Anne Moore Aff. ("Moore Aff.") ¶ 1).

For the most part, Moore's affidavit lists a number of examples of "slow-coding" by TPWs, and examples of employees taking retaliatory action against nurses whom they disliked.[6] However, none of her allegations link such conduct to any incidents of sexual harassment or reports by nurses of harassment. (*Id.* at ¶¶ 4–12).

Moore does allege one example of harassment that occurred against her. She claims that Chief Gerald Brown leered at her on several occasions, and that on the second or third time he did so, he made a comment about knowing her phone number. (*Id.* at ¶¶ 2–3).

### n. Patsy Hulec

Patsy Hulec worked at CPI for sixteen years, beginning in 1979. (Pl.'s Opp. to Defs.' Mot.Sum.J., Patsy Hulec Aff. ("Hulec Aff.") ¶ 1). Hulec is not a class member; however, she submitted an affidavit in support of Plaintiff's claims that sexual harassment at CPI was pervasive. (*Id.* at ¶ 3).

---

6. "Slow-coding" occurs when an employee purposefully responds slowly to a request for assistance.

Hulec does not recall all of the incidents of sexual harassment that she witnessed or that were reported to her. However, she does recall witnessing Diane O'Brien, an RN, surrounded by three TPWs, all of whom were touching her body. When she told O'Brien to report the incident, O'Brien refused, saying that she was afraid of the TPWs. (*Id.* at ¶ 5). Hulec informed her supervisor, Rich Thomas, about the incident and about the pervasiveness of sexual harassment at CPI, and he told her he reported it at a weekly meeting attended by the CEO, the Operations Director, the Medical Director, the Director of Nursing, the Plant Operations Director, and the Quality Assurance Director. As far as she knows, nothing more was ever done. (*Id.* at ¶ 6). Several weeks after this incident, she witnessed Newton standing behind O'Brien in the laundry room, kissing her neck. The room had been locked, and O'Brien appeared unhappy and uncomfortable. (*Id.* at ¶ 7).

Finally, Hulec alleges that she complained often to Rich Thomas that the sexual harassment at CPI caused many good nurses to leave and that something should be done about it.

### o. Kathy Dimitri

Kathy Dimitri ("Dimitri") was an RN at CPI from June of 1991 until November of 1991. Dimitri is not a class member, but submitted an affidavit in support of the class' claims. (Pl.'s Opp. to Defs.' Mot.Sum.J., Kathy Dimitri Aff. ("Dimitri Aff.") ¶ 1).

Anthony White trapped Dimitri on the elevator several times a week for a six week period. On one occasion, he pinned her to the wall and tried to kiss her. Other times, he would tell her things like "Um, would I like a piece of you." Finally, she began taking the stairs because she was so afraid to be alone with him. (*Id.* at ¶ 7). She reported these incidents to her supervisor, Ms. Sullivan. White put his arms around her one time in the nurse's station when Sullivan was there. Afterwards, Sullivan told Dimitri that some things just had to be tolerated. (*Id.* at ¶ 8). Several times, he would come to the nurse's station and put his face so close to hers that his lips were almost touching hers.

He would tell her that he'd never been with an Italian woman. (*Id.* at ¶ 9).

On one occasion, a TPW named Chappel came into her office and got down on his knees and grabbed her legs. She reported this incident to Ms. Rivers, a nursing supervisor. (*Id.* at ¶ 10). Dimitri recalls another incident where a patient was masturbating outside the nursing office window. Newton and another TPW stood by and, instead of stopping the patient, goaded him on. (*Id.* at ¶ 11).

Dimitri reported some, but not all, of the incidents of sexual harassment she experienced to nursing supervisors and to other nurses. She claims that she did not report every incident because she feared retaliation by the men she reported. (*Id.* at 14–15). She asserts that she was, in fact, retaliated against on several occasions. (*Id.* at ¶¶ 2–4, 16–18).

### B. *Conspiracy*

According to Plaintiff, Rahe and Sladewski conspired to destroy documents relevant to her claims. Shortly after Plaintiff filed a grievance with the EEOC regarding the incident with Aaron, Ruth Spencer, who maintained possession and control over documents from discovery hearings and disciplinary matters and documents relating to the BreMiller–Aaron incident, was terminated. Plaintiff alleges that after Spencer was terminated, Rahe and Sladewski removed and destroyed a substantial number of relevant documents from her office.

In support of her theory, Plaintiff claims that Spencer was not permitted to take any files with her when she was fired. As further support, she offers the affidavit of Mary Kennedy, who claims to have seen Rahe and Sladewski in Spencer's office on the day or the day after she was fired, rifling through Spencer's files. Later that day, Ameche claims to have walked by Spencer's office and noticed that everything had been cleaned out.

A number of relevant documents were allegedly removed from Spencer's office after she was terminated. For example, Plaintiff claims that Spencer's Administrator on Duty Report for the night of the BreMiller–Aaron incident was taken from Spencer's office and

destroyed. She claims that notes Spencer had taken in her personal notebook regarding the incident were also never recovered. Likewise, Spencer's report after Aaron's pre-disciplinary conference was never produced by Defendants during discovery, nor were her notes of what Aaron said at the pre-disciplinary conference. Defendants also allegedly failed to produce other documents relating to the BreMiller–Aaron incident. (*See* Pl.s' Opp. Defs.' Mot.Sum.J. at 70–72). Plaintiff further asserts that numerous other files were removed from Spencer's office, including her files of old disciplinary actions against CPI employees, and also claims that Mary Kennedy has identified a number of incident reports concerning sexual harassment that were never turned over. Plaintiff maintains that those documents which were not turned over by Defendants during discovery must have been destroyed by Rahe and Sladewski.

### III. DEFENDANTS' MOTION TO DECERTIFY THE CLASS

Plaintiff contends that the class action should be allowable on all categories of Plaintiff's Title VII claims, including her gender-based disparate treatment, hostile work environment and retaliation claims. *See* Status Conference Order of November 30, 1999. She acknowledges that were each of these claims separate causes of action, there would not be a sufficient number of putative class members with claims for gender-based disparate treatment or retaliation to certify either cause of action for class action treatment. *Id.* However, she contends that such claims are subsumed by her hostile work environment claim, and in particular, that at least retaliation should be regarded as an element of a particular class member's damages once Defendants' liability to the class under the hostile work environment claim has been established. *Id.* She also maintains that her claim under 42 U.S.C. § 1983 that Defendants violated her equal protection rights under the Fifth and Fourteenth Amendments should be considered in conjunction with her Title VII hostile work environment claim for purposes of class certification because such claims require the same proof to show liability. *Id.* Plaintiff agrees that none

of her other remaining claims are certifiable. *Id.*

Rule 23(a) of the Federal Rules of Civil Procedure sets forth the prerequisites for maintaining an action as a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Defendants argue that Plaintiff's class should be decertified because Plaintiff cannot satisfy a single one of the four requirements of Rule 23(a).

### A. *Numerosity*

"There is no specific number below which class action relief is automatically precluded. Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case." *Senter v. General Motors Corp.,* 532 F.2d 511, 523 n. 24 (6th Cir.1976). Rather, courts must evaluate a number of factors pertaining to the propriety of joining all potential class members, including the kind of action at issue, the size and scope of individual claims and the inconvenience of conducting individual lawsuits. *Jenson v. Eveleth Taconite Co.,* 139 F.R.D. 657, 664 (D.Minn.1991), *aff'd in part and vacated and remanded in part on other grounds,* 130 F.3d 1287 (8th Cir.1997). In *Senter,* for example, the numerosity requirement was met where the proposed class consisted of all black employees who were denied promotional opportunities by defendant during a given period, only sixteen of whom had been identified. *Senter,* 532 F.2d at 523. Blacks comprised fourteen percent of the work force at the General Motors division in issue. *Id.* According to the court, it was reasonable to infer that a substantial number of them were includable in the class eligible for relief and that their joinder would be impracticable. *Id.*

Defendants maintain that discovery has revealed that there are only six class members, but accept thirteen (the number of persons whom Plaintiff asserts have come forward), for purposes of their Motion to Decertify.[7] Defendants contend that each of the class members lives within the Cleveland or Elyria area which means that all members would have easy access to the court. Consequently, they argue that Plaintiff cannot show that the small number of persons who have come forward and the geographic proximity of such persons prevent Plaintiff from showing that joinder is impracticable as required by Fed.R.Civ.P. 23(a)(1).

Plaintiff disagrees with Defendant's analysis of the number of class members. She contends that in order to determine the proper number of putative class members, the court must look at the number of potential class members who did not opt out of the class. Specifically, Plaintiff asserts that, out of the 344 potential class members who were identified by Defendants and to whom class notices were sent, only 132 opted out, leaving 212 persons remaining in the class. She cites the language of the class notice in support of her position that this is the appropriate method for determining the class size:

> If you wish to participate in this class action, you do not have to do anything at this time. This action will proceed to determine whether or not defendant CPI is liable for sexual harassment and/or sex discrimination on or after February 5, 1993. If defendant CPI is ultimately determined to be liable for such sexual harassment and/or sex discrimination, notice of that judgment will be published and you will be provided an opportunity to present evidence of the sexual harassment and/or sex discrimination that you suffered and evidence of any damages to which you may be entitled.

Pl.'s Br.Opp. Defs.' Mot. to Decertify the Class at 4.

■■■ The court agrees with Plaintiff that the fact that only thirteen class members have come forward is not determinative of the size of Plaintiff's class. Consistent with the notice to putative class members, what is relevant here is not the number of class members who have actually come forward with claims of sexual harassment, but the number of persons who have not opted out of the class action. In this case, 132 potential class members have opted out, leaving 212 who have not. As in *Senter*, it is reasonable to infer that a substantial number of these women have claims against the defendants and that they will come forward if defendants are ultimately determined to be liable. Joinder of such a potentially large number of people would be impracticable; thus, Plaintiff's class satisfies the numerosity requirement under Rule 23(a)(1).

### B. *Commonality*

■■■ Rule 23(a)(2) "does not require that all the questions of law and fact raised by the dispute be common; nor does it establish any quantitative or qualitative test of commonality. All that can be divined from the rule itself is that the use of the plural 'questions' suggests that more than one issue of law or fact must be common to members of the class." *Markham v. White*, 171 F.R.D. 217, 222 (N.D.Ill.1997) (quoting 7A Charles A. Right, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 1763 at 196–98 (2d ed.1986). *See also Senter*, 532 F.2d at 524. It is to be expected that there will be some factual differences between individual plaintiffs; moreover, the commonality requirement may be met if the common questions go to liability despite individual differences in damages. *Jenson*, 139 F.R.D. at 664.

The commonality requirement was met in *Senter* because "[t]he operative fact in an action under Title VII is that an individual has been discriminated against because he was a member of a class." *Senter*, 532 F.2d at 524. In so holding, the court commented on the bifurcated nature of a Title VII class action:

> Initially it is incumbent on the class to establish that an employer's employment practices have resulted in cognizable depri-

---

7. Defendants list Susan Mason, Mary Kennedy, Lori Millard, Monica Norman, Tara Foreman and Cecelia Cooper as the only potential class members.

vations to it as a class. At that juncture of the litigation, it is unnecessarily complicating and cumbersome to compel any particular discriminatee to prove class coverage by showing personal monetary loss. What is necessary to establish liability is evidence that the class of ... employees has suffered from the policies and practices of the particular employer. Assuming that the class does establish invidious treatment, the court should then properly proceed to resolve whether a particular employee is in fact a member of the class, has suffered financial loss, and thus entitled to back pay or other appropriate relief.

*Id.* (quoting *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437, 443–444 (5th Cir. 1974). Significantly, in several cases in which plaintiffs have sought class-wide relief for sexual harassment by employers, courts have found Rule 23(a)'s commonality provision to be satisfied even in the face of challenges by defendants that such claims require highly individualized treatment. *See, e.g., Warnell v. Ford Motor Co.*, 189 F.R.D. 383 (N.D.Ill.1999) (finding that sexual harassment claims could be addressed on a class-wide basis and that the common question of law in such cases is whether a reasonable woman would find the work environment hostile); *Markham,* 171 F.R.D. at 222 (finding that individual differences in each class member's subjective perception and response to harassment did not detract from the satisfaction of the commonality standard). As the *Markham* court explained, "[i]nquiry into each class member's subjective perception and response will of course be relevant to damages. But individual differences in that respect do not detract from the satisfaction of the commonality standard."

Defendants contend that Plaintiff's class cannot satisfy the commonality requirement under Rule 23(a)(2) because Plaintiff's claims are substantially factually different from the claims of the other class members who have come forward. In particular, Defendant argues that Plaintiff's alleged injuries are more severe than those of the other class members, that Plaintiff is one of only two employees who reported the alleged incidents of sexual harassment against her to management, and that Plaintiff is one of four employees in the class who no longer works at CPI. Defendants also contend that the claims of Plaintiff and her class members do not share common questions of law.

■ Plaintiff alleges that she and the members of her class were victims of a sexually hostile work environment at CPI. In so doing, she (and other members of the class) has listed a number of incidents involving the harassment of female employees of CPI by their male colleagues. In other words, the questions common to all members of Plaintiff's class will relate to the allegedly hostile environment caused by sexual harassment at CPI and Defendants' liability for such harassment. As in *Markham,* the fact that the subjective perception and response of individual class members may have differed, while relevant to damages, does not mean that the commonality requirement cannot be satisfied. In this case, Plaintiff and the class members allege many overlapping facts; moreover, they all are bound by a common legal theory. Consequently, that some facts concerning alleged incidents of sexual harassment in this action differ from one another and appear to be more severe than others is insufficient to defeat the commonality requirement.

### C. *Typicality*

■ Rule 23(a)(3) requires that the claims of the representative be typical of the class. "The commonality and typicality requirements of Rule 23(a)(3) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. v. Falcon,* 457 U.S. 147, 157–58 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Like Rule 23(a)'s commonality provision, "[t]o be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Senter,* 532 F.2d at 525 n. 31.

■ As stated earlier, Plaintiff's claims and the claims of the class members are

based on the same legal theory. Plaintiff, like her class members, alleges that she endured sexual harassment at CPI, that the CPI administration was unwilling to address such harassment, and that she experienced the same kinds of threats and retaliation that other class members have experienced. Consequently, the court finds that the typicality requirement of Rule 23(a)(3) is also satisfied.

### D. *Adequate Representation*

■ Rule 23(a)(4)'s adequate representation requirement is twofold: (1) the representative must have common interests with the unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. As discussed above in relation to both the commonality and typicality requirements, Plaintiff meets the first prong of the adequacy test. Essentially, she is "interested in seeing that she and all of the other employees and former employees at CPI are fairly and adequately compensated for the sexual harassment they suffered." Pl.'s Br.Opp. Defs.' Mot. to Decertify the Class 13. Clearly, Plaintiff's interests in this case do not conflict with, but rather are aligned with, the other class members' interests. Also, given Plaintiff's advocacy of this matter to date and the class members' satisfaction with Plaintiff's counsel, the court also finds that Plaintiff meets the second prong of the adequacy test.

As Defendants have moved to decertify the class only on the basis that Plaintiff has failed to satisfy the requirements of Rule 23(a), the court will not revisit its analysis of the class action prerequisites set forth in Rule 23(b). Because the court finds that, with respect to her sexual harassment hostile work environment claim, Plaintiff's class meets all four requirements of Rule 23(a), the court denies Defendants' Motion to Decertify the Class on this claim. However, Plaintiff's gender-based disparate treatment claim and her retaliation claim are clearly separate causes of action from her hostile work environment claim. Significantly, as is evident from the discussion below in Sections IV.B.1–3, all three require proof of distinct elements in order to establish a *prima facie* case. Inasmuch as Plaintiff has acknowledged that, should this court find they are three separate claims, there are insufficient putative class members with claims for gender-based disparate treatment or retaliation to certify either cause of action as a class, the court concludes that neither of these claims will be included in the class definition. Moreover, as will be discussed below, the court finds that Defendants are entitled to summary judgment on Plaintiff's gender-based disparate treatment claim. The court agrees with Plaintiff, however, that her equal protection claim of sexual harassment under 42 U.S.C. § 1983, like her sexual harassment hostile work environment claim, is maintainable as a class action because it requires the same proof to show liability.

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . .

A fact is material if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Rule 56(e) specifies the way parties may establish those material facts when utilizing affidavits:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

The court then considers that evidence, along with the materials identified in Rule 56(c), in "the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citation omitted).

When considering whether the evidence shows there is a genuine issue of material fact preventing entry of judgment as a matter of law, the court should rule "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, "[t]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In most civil. cases, then, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Consequently, there are two methods by which a party who does not have the burden of proof at trial—here, Defendants—may pursue summary judgment. First, Defendants may put forth evidence showing the nonmovant—Plaintiff—will not be able to prove an essential element of their case at trial. Second, Defendants may put forth affirmative evidence showing the truth of their claims or defenses. Under either method,

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Hence, if Defendants either adequately challenge Plaintiff's ability to carry her burden of proof or affirmatively prove one of their defenses, Plaintiff will then have an affirmative duty to point out specific facts in the record creating a genuine issue of material fact. *Liberty Lobby,* 477 U.S. at 256–257, 106 S.Ct. 2505.

### B. *Law and Analysis*

#### 1. Sexual Harassment

Defendants move for summary judgment on the class' sexual harassment claim, arguing that Plaintiff and the class members cannot establish a *prima facie* case of hostile work environment. For the reasons that follow, the court disagrees with Defendants and finds that Defendants are not entitled to judgment as a matter of law on the class' sexual harassment claim.

##### a. *Individual Sexual Harassment Claims*

 Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color religion, sex, or national origin. . . ." 42 U.S.C. § 2002e–2(a)(1). Discrimination based on sex which creates a hostile or offensive work environment violates Title VII. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Abeita v. TransAmerica Mailings, Inc., et al.,* 159 F.3d 246, 250 (6th Cir.1998). Hostile work environment sexual harassment occurs when sexual harassment is "sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment and create[s] an abusive working environment.' " *Meritor,* 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)).

 Plaintiff and the class members have alleged a hostile work environment based on sexual harassment by both co-workers and supervisors.[8] In either case, a plaintiff must

---

8. Plaintiff cites to an alleged relationship between Rahe, CEO of CPI, and Sladewski, head of security, as support for her sexual harassment claim. She alleges that such relationship

amounts to *quid pro quo sexual harassment, which occurs when an employee's submission to unwelcomed sexual advances is an express or implied condition of receiving job benefits or her*

prove that (1) she was a member of a protected class; (2) she was subjected to unwelcomed sexual harassment; (3) the harassment complained of was based on her sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment that seriously affected the psychological well-being of the plaintiff; and (5) employer liability. *Williams v. General Motors Corp.*, 187 F.3d 553, 560–561 (6th Cir. 1999).

The framework for assessing the fifth element in a hostile work environment action based on harassment by co-workers differs from that based on harassment by a supervisor. In a co-worker case, a plaintiff must show that the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir.1999). The Supreme Court recently changed the final element of a supervisor case in *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). Formerly, the plaintiff was required to show that the supervisor's harassing actions were foreseeable or fell within his or her scope of employment and that the employer failed to respond adequately and effectively. This standard was raised in *Faragher* and *Burlington;* now an employer has an affirmative duty to prevent sexual harassment by supervisors. However, the *Faragher* and *Burlington* Courts devised an affirmative defense for employers in instances where an employee establishes actionable discrimination involving no tangible job consequences. *See, e.g., Faragher*, 524 U.S. at 807–809, 118 S.Ct. at 2293. In such cases, an employer may escape liability if it can show: "(a) that [it] . . . exercised reasonable care to' prevent and cor-

rect promptly any sexual harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.*

Because the first four elements are the same in co-worker and supervisor cases, a court is not to "conduct separate analyses based on the identity of the harasser unless and until considering employer liability." *Williams*, 187 F.3d at 562. Rather, in determining whether the alleged sexual harassment is severe or pervasive enough to constitute a hostile work environment, a court must consider the "totality of the circumstances." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). *See also Williams*, 187 F.3d at 561. The *Harris* Court suggested a nonexhaustive list of factors to be used in making, this determination: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. . . ." *Harris*, 510 U.S. at 23, 114 S.Ct. at 367. The Sixth Circuit has explained that:

> the totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action . . . As one court has noted . . . "[A] holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes."

refusal to submit to such demands will result in a tangible job detriment. *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 186 (1992). She claims that female employees' knowledge of the relationship between Sladewski and Rahe added to their belief that sexual harassment at CPI was tolerated by management. The court

finds that the alleged relationship between Rahe and Sladewski does not add any support to the class' claims and will not consider it in reaching its decision. Plaintiff did not even bring a *quid pro quo* sexual harassment claim nor is there is any evidence that the alleged relationship between Rahe and Sladewski was non-consensual.

*Williams,* 187 F.3d at 563 (quoting *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1524 (M.D.Fla.1991).

Finally, the totality of the circumstances test and the factors proposed by the *Harris* Court must be used to judge the conduct in question by both an objective and a subjective standard. "The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.... This standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Abeita,* 159 F.3d at 251 (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367.

### b. *Class Action Sexual Harassment Claims*

■■■■ The legal standard in a sexual harassment case tried as a class action differs somewhat from cases involving individual plaintiffs. *Jenson v. Eveleth Taconite Co.,* 824 F.Supp. 847, 875 (D.Minn.1993). In a class action, the class must establish that the defendant engaged in a "pattern or practice of unlawful discrimination...." *Id.* (quoting *Craik v. Minnesota State Univ.,* 731 F.2d 465, 470 (8th Cir.1984)). *See also Wooldridge v. Marlene Indust. Corp.,* 875 F.2d 540, 545 (6th Cir.1989) (discussing pattern or practice standard in context of class action challenging defendant's maternity leave policy). Discriminatory acts which are not "isolated, insignificant or sporadic, but [are] repeated, routine, or of a generalized nature" result in a pattern or practice of discrimination. *Id.* (quoting *Catlett v. Missouri Highway and Transp. Comm'n,* 828 F.2d 1260, 1265 (8th Cir.1987), *cert. denied,* 485 U.S. 1021, 108 S.Ct. 1574 (1988)). "[T]he landscape of the total work environment, rather than the subjective experiences of each individual claimant, is the focus for establishing a pattern or practice of unwelcome sexual harassment which is severe and pervasive." *Equal Employment Opportunity Commission v. Mitsubishi Motor Manufacturing of America, Inc.,* 990 F.Supp. 1059, 1074 (C.D.Ill.1998). The existence of a company's policy of exposing women to a sexually hostile work environment is the basis for pattern or practice liability. *Id.*

Sexual harassment class action cases are generally divided into two phases: Phase I comprises the liability phase and Phase II comprises the individual relief phase. The determination as to whether the plaintiff class has established that the employer engaged in a pattern or practice of tolerating sexual harassment is made during the liability phase. *Jenson,* 824 F.Supp. at 875. "[A]t issue ... is the common question of law which makes a class action an appropriate vehicle for prosecuting claims of sexual harassment: 'whether a reasonable woman would find the work environment hostile.' " *Id.* (quoting *Jenson v. Eveleth Mines,* 139 F.R.D. 657, 665 (D.Minn.1991)).

■■■■ Once an employer is found liable under the pattern or practice standard, the plaintiff class is entitled to appropriate prospective relief. *Id. See also Mitsubishi,* 990 F.Supp. at 1073 ("If a company engages in a pattern or practice which is proved by an objective test, and the company is negligent in preventing it, then the [class] ... can and should be able to obtain injunctive relief, regardless of whether some of the individuals may have no subjective objection to the harassing conduct.") Additionally, in the typical pattern or practice case, once it has been established that the defendant engaged in a pattern or practice of sexual harassment, class members are entitled to a presumption of liability on their individual claims. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 359–60, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The typical pattern or practice construct, however, does not wholly apply to a hostile environment claim as such a claim requires proof of subjective harm. *Mitsubishi,* 990 F.Supp. at 1077. In other words, because proof of subjective harm is not relevant to the pattern or practice case and should not be admitted in the liability phase, an individual claimant has the burden of making her subjective showings in Phase II of a class action sexual harassment case. *Id.*

However, "the finding of objective discrimination in Phase I may be applied in Phase II to relieve an individual claimant of her *prima*

*facie* burden to prove that element." *Id.* at 1078. *But see Jenson,* 824 F.Supp. at 576 (holding that individual claimants are not entitled to any rebuttable presumption at the individual relief phase). Moreover, as the *Mitsubishi* court noted, "[t]he proof needed to establish a subjective perception of abuse in the typical individual case for hostile environment ... is minimal, virtually a formality; the charging party must merely testify that she found the alleged conduct to be hostile or abusive at the time it occurred." *Id.*

c. *The Class' Hostile Environment Claim*

(i.) *Are the Class Members Part of the Protected Group?*

The class members, as women, are members of the protected group.

(ii.) *Were the Class Members Subjected to Incidents of Unwelcome Sexual Harassment?*

Taking Plaintiff's version of the facts as true, it appears that the work environment at CPI was sexually charged in a way that was offensive and demeaning to women.[9] Many women at CPI were consistently forced to deal with physically invasive behavior by male employees. Routinely, men would touch, grope and fondle them inappropriately. In elevators, in the medication rooms, and in other places throughout CPI, women were made to endure these offensive acts. Such physical contact ranged in severity from males placing their hands on parts of women's bodies to BreMiller's allegation that Aaron committed sexual assault on her at gunpoint. Male employees would also do such things as expose themselves to their female co-workers or touch their genitals while making suggestive remarks.

Frequently, women were subjected to requests for sexual intercourse or oral sex by their male-counterparts. Women were called names such as "bitch" and "whore" and were "subjected to language which derogated them and their sex in general, either by the meaning of the words themselves or through the meaning which was derived from the way in which the words were uttered." *Jenson,* 824 F.Supp. at 880. "No female employee should be made to endure sexually suggestive language ... from male employees ..." *Id.* (citing *Tunis v. Corning Glass Works,* 747 F.Supp. 951 (S.D.N.Y.1990)). Some men would repeatedly ask women for dates, even after the women sought after had refused their advances. Darlene Cooper Clay alleges that a sign stating "sexual harassment will not be allowed in the workplace, but will be graded" was present in the bathroom on her floor for several months. Lori Millard claims that a letter was circulated calling her a "white bitch" and a "whore". A number of the class members also allege that they either witnessed men sexually harassing other women or that other women told them of incidents of sexual harassment they had endured. *See Abeita,* 159 F.3d at 252 (noting that sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII).

As for whether the harassment was unwelcome, in the class action context, "a finding of unwelcomeness is justified where the plaintiff class shows by a preponderance of the evidence that women, by their conduct indicated that the acts of sexual harassment were unsolicited and regarded as undesirable or offensive." *Jenson,* 824 F.Supp. at 883. In this case, the evidence strongly indicates that the sexual harassment experienced by women at CPI was unwelcome. There is no evidence that any acts of sexual harassment were solicited by the class members. In many instances, women claim to have told their male co-workers that their verbal comments and actions were improper and on some occasions, complained to supervisors about the harassment. There is almost no evidence that women invited acts of sexual harassment or found such acts to be acceptable.

(iii.) *Was the Harassment Based on Sex?*

Defendants argue that many of the incidents complained of were non-sexual in na-

---

9. It is important to note that the fact that incidents were or were not reported is irrelevant to a determination of whether or not a hostile environment existed. "[A]t the summary judgment stage the district court must assume that all of plaintiff's allegations pertaining to the issue of a hostile work environment are true and give [unreported incidents] ... no less weight than reported incidents." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998).

ture, and therefore cannot be used to meet this element of the class members' case. Under this theory, Defendants discount allegations such as men placing their hands on women employees' knees or shoulders, Anthony White's placing his hand on Lori Millard's stomach when she was pregnant, and Mumford's comment that Foreman's unit was "titty-city" as non-sex based.

The *Williams* court explicitly held that in examining conduct alleged to create a sexually hostile work environment, "the conduct underlying, a sexual harassment claim need not be overtly sexual in nature." *Id.* at 565. As the court explained, "the law recognizes that non-sexual conduct may be illegally sex-based where it evinces 'anti-female animus, and therefore could be found to have contributed significantly to the hostile environment.'" *Id.* at 564 (quoting *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 905 (1st Cir.1988)). In *Williams,* the court found that it was error for the district court to disregard pranks such as gluing a box to the plaintiff's desk, locking her in a tool crib [10], and blocking her entrance to the crib as well as employee remarks such as "I am sick and tired of these fucking women" in determining whether the plaintiff was subjected to a sexually hostile work environment. *Id.* at 564–565. According to the court, such conduct should be considered along with explicitly sexual conduct in reaching this determination.

The vast majority of the conduct alleged by the class members is explicitly sexual in nature and therefore easily satisfies this element of a hostile environment claim. Moreover, under *Williams,* those incidents that Defendants argue cannot be considered for purposes of imposing liability, can indeed be found to have contributed to a hostile work environment because they "evince[ ] anti-female animus". *Id.* at 564.

(iv.) *Did the Sexual Harassment Interfere with the Plaintiffs' Work Performance and Create an Intimidating, Hostile, or Offensive Work Environment?*[11]

██ As discussed above, whether sexual harassment was severe and pervasive enough to have the effect of unreasonably interfering with the plaintiff's work performance and of creating an intimidating, hostile, or offensive work environment is to be judged by evaluating the "totality of the circumstances".[12] Moreover, in *Abeita,* the Sixth Circuit recently held that, in evaluating whether conduct is severe or pervasive, courts must take into account a plaintiff's claim that sexual comments were commonplace, ongoing or continual. 159 F.3d at 252. If such is true in a given situation, the plaintiff's complaints may be considered as more severe or pervasive than an instance where a plaintiff complains of similar comments, but only recalls several specific, rather isolated incidents. *Id.* Finally, in assessing whether this element has been satisfied, a court must determine whether women are forced to spend their work day running "a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. If so, the reasonable woman would find the terms, conditions and privileges of her employment altered by that sexual harassment.

██ Considering the totality of the circumstances, the court finds that there is a genuine issue of material fact with respect to whether a reasonable woman would find that

---

10. A tool crib is a warehouse used to store materials and components used at the plant.

11. The court will consider only the objective portion, not the subjective portion, of this element: "would the 'reasonable woman' consider the conduct sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment?" *Jenson,* 824 F.Supp. at 885. As discussed above, in the liability phase of a class action sexual harassment lawsuit, only the objective portion need be proven.

12. In arguing that the class cannot establish that the reasonable woman would consider the com-

plained-of conduct to be so severe and pervasive as to create an abusive work environment, Defendants state, "When Plaintiffs' claims of sexual harassment are carefully examined, particularly in the context Plaintiffs' [sic] claim that they arose, many are clearly revealed as isolated, inoffensive or nonsexual in nature. Only one reported sexual incident (the BreMiller Aaron incident)—isolated and highly questionable—remains." (Defs.' Reply Supp.Mot.Sum.J. at 28). Under the "totality of the circumstances" test, this argument is unavailing.

the working environment at CPI was abusive or offensive in such a way as to alter the terms and conditions of her employment. Women at CPI experienced constant and pervasive comments of a sexual nature; requests for sexual favors; touching, groping and fondling by male counterparts; name-calling; and other actions tending to show that women were seen as sexual objects. Such comments and actions were routinely directed at class members, and class members also frequently witnessed or heard of other women enduring similar hostility. In several cases, class members complained that they were sexually harassed nearly every day, so many times that they cannot recall each specific instance of harassment. Most women state that they were offended and affected a great deal by the harassment they experienced and in some cases informed their harassers that their advances were unwelcome. Taking the class members' complaints as a whole, a reasonable jury could conclude that the sexualized environment that existed at CPI made it clear to women that they were perceived primarily as sexual objects. Moreover, it could be inferred that a reasonable woman working at CPI would find that such perception altered the terms and conditions of her employment by making it more difficult to do her job and affected her psychological well-being. *See Williams*, 187 F.3d at 567 (finding that in order for an employee to establish that her work was affected by the harassment, she "need only show that the harassment made it more difficult to do the job.")

### (v.) *Did Management Have Knowledge of the Harassment and, if so, Did it Appropriately Respond?*

In arguing that the class members cannot establish a *prima facie* case of sexual harassment, Defendants concentrate to a large degree on the last element of the class' claim. Their argument rests primarily on the fact that many of the women who now complain of sexual harassment at CPI never reported such harassment to CPI management. In Defendants' view, they cannot be held liable for any unreported incidents of sexual harassment. They claim that their position is supported by two additional facts. First,

at all relevant times, CPI had a written policy with regard to reporting incidents of sexual harassment. Second, they state that CPI satisfactorily resolved the vast majority of claims of sexual harassment that were brought to management's attention.

### (a.) *Co–Worker Sexual Harassment*

As discussed above, in a co-worker sexual harassment case, a plaintiff must show that the employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir.1999). *See also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 804 n. 11 (6th Cir.1994) (noting that "the term 'respondeat superior,'—which connotes derivative liability—is an incorrect label for co-worker harassment cases, where the employer is directly liable for its own negligence"). Once an employer has responded to a charge of co-worker sexual harassment, it "can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir.1997). *See also Summerville v. Ross/Abbott Laboratories*, 187 F.3d 638 (6th Cir.1999). In other words, negligence as to the existence of sexual harassment is sufficient to impose employer liability; however, "negligence in the fashioning of a remedy is not." *Blankenship*, 123 F.3d at 873. *See also Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 50 (6th Cir.1996) ("This standard is one of failure-to-correct-after-notice or duty to act after knowledge of harm.").

The "knew or should have known" standard in co-worker cases means that an employer's actual knowledge of the harassment is unnecessary. Accordingly, a woman need not actually report an incident of sexual harassment, and an employer will not necessarily escape liability if she does not. "An employer may be charged with knowledge when an employee or employees complain to management, or when the sexual harassment is pervasive, which gives rise to an inference of knowledge or constructive knowledge." *Jenson*, 824 F.Supp. at 886.

"[I]f the harassment is pervasive, as it certainly must be in a pattern or practice case it can be presumed, subject ... to rebuttal, to have come to the attention of someone authorized to do something about it." *Mitsubishi*, 990 F.Supp. at 1072 (citations omitted). In addition, a company can be presumed to be on "notice" of harassment if its supervisors had actual knowledge of the harassment (some of them may have participated in the harassment, some may have simply worked closely with those who did, and others may have been informed of harassment by women who were not their direct subordinates) and "if these supervisors had a duty or reasonably could be believed to have such a duty, under the company's sexual harassment policy, to 'pass on the information to someone within the company who has the power to do something about it.' " *Id.* at 1074–75 (quoting *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir.1997)).

 Remediation of a policy or practice of tolerating company-wide sexual harassment requires that a company take steps to address the problem on a company-wide basis. *Id.* at 1075. Once a company has actual or constructive knowledge of sexual harassment on a large-scale, it is not enough to claim that it investigated individual claims; "situation-specific" responses will not suffice. *Id.* Rather, "steps must be taken to determine whether individual incidents, which occur frequently and continuously, are 'indicative of a larger problem requiring a company wide response.' " *Id.* (quoting *Jenson*, 824 F.Supp. at 887).

The determination as to whether an employer is "negligent" in a pattern or practice case has been summarized as follows:

> [It must be shown] that the employer had notice, failed to take steps to remedy the company-wide problem of harassment that it knew or should have known about, and, if it took steps, failed to take effective steps. Such a showing should be sufficient to establish a "policy" of tolerance by the company toward sexual harassment that would justify a finding of pattern or practice liability, so long as the other objective showings necessary to establish the exis-

tence of severe and pervasive harassment on a wide-scale basis are in place.

*Id.* at 1076.

The court finds that Plaintiff and the class members have produced sufficient evidence on the issue of whether CPI had actual or constructive knowledge of company-wide sexual harassment, and if so, whether it took appropriate steps to remedy the situation, to submit this question to a jury. Viewing the facts in a light most favorable to the plaintiff class, sexual harassment at CPI was so pervasive that an inference of knowledge arises. The sexual harassment complained of occurred too routinely "to have escaped [CPI's knowledge] had its management been reasonably alert." *Jenson*, 824 F.Supp. at 886. This is true even in light of Defendants' argument that sexual harassment was not the norm at CPI given the small number of alleged victims in a large putative class. This argument goes to the weight of the class members' evidence on CPI's knowledge, a matter for the finder of facts, and does not work to insulate Defendants from liability. *See id.* at 887 ("[T]he size of a plant or facility may increase, but does not decrease, an employer's burden to provide an environment reasonably free of sexual harassment.")

Moreover, not only were class members commonly subjected to sexual harassment by co-workers, they allege that several supervisors participated in the harassment. Additionally, several members allege that they informed their direct supervisors or other supervisor-level personnel of the harassment in an attempt to remedy the situation. For example, BreMiller alleges that she both told David Sladewski of harassment she had experienced, and experienced sexual harassment by Sladewski himself. She also claims to have been harassed by Chief Gerald Brown. Mary Kennedy frequently informed Rich Thomas of sexual harassment she had experienced. She also informed Ruth Spencer and Debra Davis of at least one incident. Norman reported to Sladewski that Anthony White had slammed her into a desk while licking her face, grabbing her breasts and groping her under her dress. She attempted to inform Rahe of the incident, but Rahe allegedly would not listen. Numerous other

supervisor-level personnel were either told directly by class members of incidents of sexual harassment, or were present when harassment occurred. Even if these individuals did not have management authority, it can be assumed that each had a "strong *de facto* duty to act as a conduit to management for complaints about work conditions." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 64 (2d Cir.1998). Significantly, each had a duty under CPI's sexual harassment policy to call the EEO officer immediately for technical assistance upon notice of an incident. Indeed, the failure by most supervisors who were informed of sexual harassment to either call the EEO officer upon notice of an incident or to refer a complainant to the EEO officer establishes that CPI's complaint procedure was not effective. Because CPI's complaint procedure was ineffective, CPI could not legitimately rely on its employees to bring problems of sexual harassment to its attention for purposes of determining its knowledge. In light of this evidence, there is a genuine issue of material fact as to whether CPI knew or should have known of the hostile work environment alleged to have existed at CPI.

Given its knowledge, CPI had a responsibility to respond to its sexually hostile work environment. Its response, however, was inadequate in that it was "situation specific: [CPI] responded only to complaints about specific incidents of sexual harassment. At no time did [CPI] take any steps to determine whether the incidents were indicative of a larger problem requiring a company-wide response." *Jenson*, 824 F.Supp. at 887. In fact, when Ameche allegedly attempted to take matters into her own hands by instructing incoming nurses on what to do about sexual harassment, Rahe made her cease giving such instruction. While Defendants contend that Ameche was told not to include information on sexual harassment in her orientation classes because she was not properly trained on the subject, they do not assert that an alternative solution was proposed by CPI.

Moreover, even in those instances in which CPI did respond to reports of sexual harassment, its response was not always appropriate. For example, Verdelle Hart responded to Millard's complaint about harassment by Timothy Swanson by telling "several male employees to talk to Swanson and let him know he should treat Millard with respect." Defs.' Reply Supp.Mot.Sum.J. at 24. Hart did not follow company policy that required her to report Swanson's complaints to the EEO officer, nor do Defendants allege that Hart referred Millard to the EEO officer as she was also required to do. Likewise, when Norman complained to Sladewski about the incident with White, Sladewski did not follow the proper channels or attempt to remediate the situation in any way other than to tell Norman to be careful. Rahe did not even acknowledge Norman's complaint. These are only two among many alleged instances in which supervisors failed to follow the proper channels or remedy a given incident of harassment. Such failures to comply with the company's own reporting requirements tends to show that CPI's response to its sexually hostile work environment was inadequate.[13] *Distasio*, 157 F.3d at 64.

### (b.) *Supervisor Sexual Harassment*

As discussed earlier, the only difference between a sexual harassment claim based on harassment by a supervisor as opposed to harassment by a co-worker is the knowledge element. Under *Faragher* and *Burlington*, in cases involving no tangible employment action, as in the instant situation, an employer can only escape liability for its failure to prevent sexual harassment by supervisors if it satisfies both elements of the affirmative defense created in those cases. It must have: (a) exercised reasonable care to prevent and correct promptly any sexual harassing behavior, and the plaintiff must have (b) unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807–809, 118 S.Ct. at 2293.

---

**13.** Defendants themselves state that Hart handled the situation "in an unorthodox manner" and that her response "was not the preferred or

proper way to handle the matter." Defs.' Reply Supp.Mot.Sum.J. at 24.

■ Defendants assert that they are entitled to summary judgment on the class' claims of sexual harassment by supervisors (David Sladewski, Gerald Brown, Dean Burden and Elvida Sewell are the alleged perpetrators) because the class members unreasonably failed to avail themselves of CPI's sexual harassment complaint procedures. However, as the court finds that there is a genuine issue of material fact as to whether Defendants meet the first element of their affirmative defense, it is not necessary to even address the second element to determine that Defendants are not entitled to summary judgment on the class' claims of supervisor liability. First, to the extent that Defendants attempt to rely solely on CPI's complaint procedure in support of their claim that they are entitled to *Faragher's* and *Burlington's* affirmative defense, the court is not persuaded. CPI's sexual harassment policy clearly was not effective in eradicating sexual harassment at CPI. Further, as already discussed, many supervisors, including Sladewski, who were on notice of incidents of sexual harassment did not even follow the procedures outlined in the policy. Also as discussed earlier, CPI never responded on a large scale to its company-wide sexual harassment problem. Rather, it merely made situation-specific attempts to remedy claims of sexual harassment, many of which attempts were inadequate. Finally, there is no allegation by Defendants that CPI ever brought any sort of disciplinary action against any of the supervisors alleged to have participated in the sexual harassment. Accordingly, Defendants are not entitled to judgment as a matter of law on the class' claims of sexual harassment by supervisors.

In sum, the plaintiff class has established that there is a genuine issue of material fact with respect to whether CPI engaged in a pattern or practice of maintaining an environment sexually hostile to women. Whether individual class members are entitled to damages that resulted from the alleged policy of harassment is relevant only during the recovery phase of the proceedings and will be determined therein should a jury first find Defendants liable for tolerating a policy of sexual harassment. Accordingly, the court expresses no opinion on that issue at this time.

### 2. Gender–Based Disparate Treatment

A plaintiff can prove discrimination through two methods. She can either present direct evidence of intentional discrimination by the defendant, or she can show the existence of circumstantial evidence which creates an inference of discrimination. *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir.1995) (citing *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114–15 (6th Cir. 1987) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). Under the second method, the plaintiff must show the following four elements: "(1) that [plaintiff] was a member of a protected class; (2) that [plaintiff] suffered an adverse employment action; (3) that [plaintiff] was qualified for the position; and (4) [that] plaintiff was replaced by a person outside the protected class." *Id.*

■ Plaintiff has not established her gender-based disparate treatment claim under either method. Indeed, she did not even address this claim in her Brief in Opposition to Defendants' Motion for Summary Judgment. Accordingly, Defendants are entitled to judgment as a matter of law on this claim.

### 3. Retaliation

Defendants also move for summary judgment on Plaintiff's retaliation claim because CPI had a legitimate reason for terminating Plaintiff. A plaintiff must establish the following to make out a *prima facie* retaliation claim:

> (1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [the plaintiff's] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Williams*, 187 F.3d at 568. Once the plaintiff establishes each of these elements, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its adverse employment action. As the last

step, the plaintiff is then given the opportunity to show that the proffered nondiscriminatory reason is pretextual, and that the true reason she was fired was in retaliation for her complaints of sexual harassment. *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 343 (6th Cir.1998), *cert. denied*, 525 U.S. 1106, 119 S.Ct. 875, 142 L.Ed.2d 775 (1999).

Defendants agree that Plaintiff satisfies the elements of the *prima facie* case of retaliation. Defs.' Mot.Sum.J. at 70. However, they contend that they are entitled to summary judgment on this claim because Plaintiff cannot overcome CPI's legitimate business reasons for its decision to discontinue using BreMiller's services. Defendants contend that, based on a concern for the safety of BreMiller and CPI employees and patients, CPI first requested that Brason's Willcare not send BreMiller back to work until an investigation into the BreMiller–Aaron incident had taken place. They claim that CPI's ultimate decision not to have BreMiller return to work at CPI was based on Rahe's belief that no sexual harassment had occurred. For her part, Plaintiff claims that it is not true that CPI merely temporarily suspended her services pending an investigation into the Aaron incident. Rather, she claims that Rahe terminated her in the June 7, 1993 meeting because she was "more trouble than she was worth." The court finds that Plaintiff has submitted sufficient evidence in support of her retaliation claim to submit this issue to a jury.

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078 (6th Cir.1994), is the leading Sixth Circuit case on establishing pretext. There are three methods by which an employer's proffered reasons for terminating an employee may be shown to be pretextual: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the] discharge, or (3) that they were insufficient to motivate discharge." *Id.* at 1084. The second method is relevant here.

BreMiller alleges that Rahe told her in the June 7, 1993 meeting that she would not be called back to work at CPI and offers deposition testimony by deBrossard, who also attended the June, 1993 meeting, as support. According to deBrossard, Rahe informed BreMiller at the meeting "that she could not work there any more." (DeBrossard Depo. at 59–60). BreMiller also alleges that, on the evening of June 7, 1993, she told both Ameche and Kucklick that she had been fired. Ameche, who allegedly spoke with Rahe soon after the meeting took place claims that Rahe told her that BreMiller had been terminated because she was "more trouble than she's worth." (Spencer Depo. at 403). Doug Wells, who served as a security consultant for the Ohio Department of Public Health during the relevant time period, also testified that soon after he found out about the BreMiller–Aaron incident, he had a conversation with Rahe in which Rahe informed him that she had canceled BreMiller's agency employment at CPI. (Wells Depo. at 77–79).

If a jury believed this evidence, it could reasonably come to the conclusion that CPI's proffered reason for terminating Plaintiff was not the actual motivation for her discharge. A reasonable inference could be drawn that BreMiller was fired because her decision to avail herself of activity protected by Title VII (complaining about the Aaron incident) caused "trouble" for CPI, a non-legitimate reason for terminating BreMiller. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's retaliation claim.

### 4. Due Process Claims

Lastly, Defendants move for summary judgment on Plaintiff's due process claims on the grounds that (1) if Plaintiff's Title VII sexual harassment claim fails, so should her § 1983 equal protection claim; and (2) Plaintiff cannot demonstrate a conspiracy pursuant to § 1985.

#### a. Equal Protection

Both parties agree that claims under Title VII and under 42 U.S.C. § 1983 "require the same proof for liability." *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483 (6th Cir.1989). Accordingly, for the same reasons as discussed above in relation

to Plaintiff's Title VII sexual harassment claim, the court finds that Defendants are not entitled to summary judgment on Plaintiff's equal protection claim under 42 U.S.C. § 1983.

### b. Conspiracy

■ Defendants assert that they are entitled to summary judgment on Plaintiff's § 1985(3) claim because there is no evidence that Rahe and Sladewski actually conspired to destroy documents relevant to Plaintiff's claims. To establish a violation of § 1985, Plaintiff must demonstrate that: "1) the defendants conspired together; 2) for the purpose of depriving [her] ... of the equal protection of the laws; 3) and committed an act in furtherance of the conspiracy; 4) which caused injury to [her] ...; and 5) the conspiracy was motivated by ... a class-based, invidiously discriminatory animus." *See Bass v. Robinson,* 167 F.3d 1041, 1050 (6th Cir.1999). The court agrees that Defendants are entitled to summary judgment on Plaintiff's conspiracy claim.

■ The record is devoid of any evidence that Rahe and Sladewski actually destroyed documents relevant to Plaintiff's claims. Plaintiff's allegation that they did so is based entirely on speculation. She claims only that several individuals witnessed Rahe and Sladewski in Spencer's office after she was terminated and that several documents which allegedly existed at one time were not produced in discovery. From that, she infers that Rahe and Sladewski conspired to deprive her of her right to equal protection of the laws by destroying relevant documents.

Defendants produced a substantial amount of information relating to both the BreMiller–Aaron incident as well as the vast majority of incidents of sexual harassment alleged to have been reported at CPI. In fact, while Plaintiff claim that Defendants did not produce incident reports regarding a number of claims of sexual harassment (see Pl.s' Opp. Defs.' Mot.Sum.J. at 73), Defendants did, in fact, produce documentation relating to the same incidents alleged to have been discussed in the incident reports at issue. In light of this, Plaintiff's claim that Defendants destroyed the incident reports is unfounded. The record is devoid of anything suggesting that Rahe and Sladewski had control of the only pertinent documents or that they destroyed them. Because Plaintiff has not brought forth even a scintilla of evidence to support her § 1985 conspiracy claim, the court grants Defendants' Motion for Summary Judgment on this count of Plaintiff's Complaint.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Decertify the Class (Doc. No. 149) is denied and Defendants' Motion for Summary Judgment (Doc. No. 197) is granted in part and denied in part. The liability phase of the trial of this case will commence at 9:00 a.m. on September 25, 2000. A separate trial order shall issue. Plaintiff's sexual harassment and § 1983 equal protection claims shall be tried as class claims. Plaintiff must try her retaliation claim as an individual.

A settlement conference will be held before Magistrate Judge Hemann with the parties on May 12, 2000, at 10:00 a.m.

IT IS SO ORDERED.